IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CV-1077-BO-RJ

| | | |
|---|---|---|
| KEVIN LYNDELL DAVIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | ORDER |
| KEITH BOWLING, et al., | ) | |
| Defendants. | ) | |

This cause comes before the Court on defendants' motion for summary judgment. [DE 29]. The appropriate responses and replies have been filed. In this posture, the motion is ripe for disposition. For the following reasons, the motion is granted.

## BACKGROUND

On November 12, 2021, plaintiff was arrested after fleeing from Brunswick County sheriff's deputies in a high-speed car chase. [DE 31, ¶ 1]; [DE 43, ¶ 1]. Lieutenant Joseph Cherry was parked by the highway "in an unmarked patrol car that night when he noticed a silver Honda with illegal window tint make an illegal pass in a no-passing zone on its way back into the county from South Carolina." [DE 31, ¶ 8]; [DE 43, ¶ 8]. "Because of the window tint, he could not see who was driving the car." *Id.* He "estimated that the car was traveling about 70 mph in a 55-mph zone and, because he had just observed the driver commit three traffic violations (speeding, illegal passing, and having illegal window tint), he notified Sgt. Keith Bowling, who was also on patrol in the area, to be on the lookout for it." [DE 31, ¶ 9]; [DE 43, ¶ 9]. Sergeant Bowling's radar placed the driver's speed at 67 miles per hour, and he put on his lights and siren to pull the driver over. [DE 31, ¶¶ 10–11]; [DE 43, ¶¶ 10–11].

"The car then made an illegal U-turn, ran off the left shoulder of the road, and sped away heading south at over 100 miles per hour, and the driver threw something out the window." *Id.* Deputy Blake Young placed "stop sticks on the highway in an attempt to puncture the car's tires and cause it to come to a gradual stop." [DE 31, ¶ 14]. This effort failed, although it did cause plaintiff to brake and slow down. [DE 43, ¶ 14]. Because the driver was headed toward a particularly dangerous intersection which "has a history of fatal vehicle collisions," Sergeant Bowling "decided to execute a precision immobilization technique, or 'PIT,' maneuver, which requires contact between the pursuing and fleeing cars that results in the fleeing car spinning out and coming to a stop in a controlled manner." [DE 31, ¶¶ 13, 15]; [DE 43, ¶¶ 15, 16].

"After the car stopped, Lt. Cherry pulled up to the scene, and he and Sgt. Bowling approached the car with weapons drawn." [DE 31, ¶ 19]; [DE 43, ¶ 19]. The driver was the plaintiff in the above-captioned matter, and the car belonged to the plaintiff's girlfriend. [DE 31, ¶ 21]; [DE 43, ¶ 21]. "The plaintiff claims that, when Lt. Cherry pulled up to the scene, his patrol car 'rammed' the car the plaintiff was in, but Lt. Cherry testified that he made minor contact with it when he tried to box it in and there was no real damage from the contact, which occurred at less than five miles per hour." [DE 31, ¶ 19]; [DE 43, ¶ 19]. Lieutenant Cherry and Sergeant Bowling found marijuana and cocaine inside the vehicle. [DE 31, ¶ 20]; [DE 43, ¶ 20].

"Lt. Cherry grabbed the plaintiff by his arm and the back of his neck and pulled him from the car." [DE 31, ¶¶ 22–23]; [DE 43, ¶¶ 22–23]. "The plaintiff claims that Lt. Cherry pulled him by his dreadlocks, and Lt. Cherry admitted his hands may have gotten entangled in them." [DE 31, ¶ 23]; [DE 43, ¶¶ 22–23]. "Deputy Young also arrived on scene and helped get the plaintiff handcuffed." [DE 31, ¶ 24]; [DE 43, ¶ 24]. "He put his knee on the small of the plaintiff's back to keep him from rolling, but he did not touch the plaintiff's neck or put a knee on it." *Id.* The car

was damaged minimally from the PIT maneuver—although all four of his tires were flat—and the plaintiff did not appear to be injured. [DE 31, ¶ 25]; [DE 43, ¶ 25].

"The plaintiff claims that Lt. Cherry called him a racial slur when he approached the car, but admitted that he did not hear it at the time and only learned about it when a friend told him to watch the videos a year and a half later." [DE 31, ¶ 44]. "Lt. Cherry denied making any slur but admitted calling the plaintiff 'an idiot.'" *Id.* at ¶ 45. Plaintiff maintains that a racial slur is clearly audible on the body camera footage of the incident. [DE 43, ¶¶ 45–47].

Plaintiff asserts claims under 42 U.S.C. § 1983 for unreasonable detention, seizure, and excessive force against Sergeant Keith Bowling, Lieutenant Joseph Cherry, Deputy Blake Young, and Sheriff Brian Chism in their individual and official capacities. He asserts official-capacity claims based on equal protection for failure to train or failure to discipline the officers involved. He also appears to assert a claim based on a Brunswick County Superior Court order requiring the return of his girlfriend's car, alleging the sheriff's office retained it despite the order. [DE 27-3].

DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the

nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

**I. Unreasonable Detention, Seizure, and Excessive Force Claims**

The defendants have raised the defense of qualified immunity as to the § 1983 claims against them. Because qualified immunity provides immunity from suit, and therefore a trial, the Court considers this issue first. Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). When a court's decision on one step is dispositive, it need not reach the other. *See Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) ("we need not reach both prongs of the analysis," citing *Pearson*, 555 U.S. at 242).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *see also Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) (court must "take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims."). A court "do[es] not make credibility determinations in resolving the first prong of the [qualified immunity] analysis." *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018). However, a court need not adopt plaintiff's version of a fact when that fact is discredited by a videotape of undisputed authenticity. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

To determine whether the defendant officers acted with qualified immunity, the first question is whether the officers violated plaintiff's Fourth Amendment rights. Law enforcement officers violate an individual's Fourth Amendment rights when they conduct unreasonable searches and seizures, including seizures "effectuated by excessive force." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This standard is objective, and thus without regard to the officer's subjective intention or motivation. *Schultz*, 455 F.3d at 477.

A court does consider, however, the facts and circumstances confronting the officer, and it must focus its attention on the moment the force was employed. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (citations omitted). Specific factors to be considered are the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee. *Graham*, 490 U.S. at 396. Whether the officer's conduct was reasonable is a question of law to be decided after determining "the relevant set of facts and draw[ing] all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott*, 550 U.S. at 381 n.8 (emphasis omitted).

*a. The PIT Maneuver—Excessive Force*

"A PIT maneuver is a law enforcement procedure whereby a police officer bumps the rear quarter panel of the suspect's vehicle with the front quarter panel of the officer's vehicle, sending the suspect vehicle into a spin." *Wilkinson v. Torres*, 610 F.3d 546, 549, n. 1 (9th Cir. 2010). "Terminating a car chase by intentionally striking a fleeing vehicle constitutes a 'seizure' for Fourth Amendment purposes." *Hammock v. Huffstickler*, No. 3:11CV242-RJC, 2011 WL 3687611, at *1 (W.D.N.C. Aug. 23, 2011). Defendants' use of a PIT maneuver was therefore a Fourth Amendment seizure. The PIT maneuver, however, creates a Fourth Amendment violation only where "the manner in which the seizure was effected was 'objectively unreasonable.'" *Hammock*, 2011 WL 3687611, at *1 (citing *Scott v. Harris,* 550 U.S. 372, 381 (2007)).

"[R]amming a suspect's car can constitute deadly force in some instances because it can result in serious injury or death." *Payne v. Moser*, 172 F.4th 408, 416 (4th Cir. 2026) (citing *Abney v. Coe*, 493 F.3d 412, 418 (4th Cir. 2007)). "A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S.

1 (1985)). "The central inquiry of an excessive force claim is whether the officer's actions were objectively reasonable under the totality of the circumstances." *Payne*, 172 F.4th at 415 (citing *Benton v. Layton*, 139 F.4th 281, 289 (4th Cir. 2025)); *see also Quinn v. Zerkle*, 111 F.4th 281, 296 (4th Cir. 2024) (court must decide "whether the officer had probable cause to believe that the suspect posed an imminent threat of serious physical harm to anyone at the very moment the deadly force was used").

Prior to Bowling executing the PIT maneuver, plaintiff had been driving approximately 100 miles per hour toward an intersection where fatal car accidents were known to occur. [DE 31, ¶¶ 11–13]. Plaintiff does not dispute the high-speed chase occurred, [DE 31, ¶¶ 12–13]; [DE 43, ¶¶ 12–13], but remarks that "all [his] tires were flat both hands out the window and the Emergency vehicle pursuit policy states no officer shall use pit maneuver until they find that there are No children or innocent people inside the car." [DE 27, p. 2]. Plaintiff further explains, "It was not necessary to perform the pit because I hit the stop sticks foot was on brakes and I already had went thru the intersection[.]" [DE 43, ¶ 17].

First, the transcript from plaintiff's criminal trial reveals that the intersection through which he had passed when Bowling executed the PIT maneuver was at Thomasboro Road. Further ahead is Hickman Road, the dangerous intersection about which the officers were concerned. [DE 16-2, pp. 110–113]. There is no genuine dispute that plaintiff was headed toward an intersection the officers knew to be dangerous when Bowling executed the PIT maneuver.

All three of the *Graham* factors weigh in defendants' favor, as plaintiff was actively fleeing by driving at a dangerous speed, and posed an immediate threat to other motorists on the highway and in the intersections ahead. Plaintiff contends that because his hand was out the window and he had begun to brake after hitting the stop sticks and before the PIT maneuver, there "was no reason

for Bowling to use deadly force[.]" [DE 42, p. 6]. But on Bowling's dash camera video, plaintiff can be seen driving a substantial distance with his hand out the window. Long before running over the stop sticks, plaintiff's brake lights came on, and his hand can be seen outside the vehicle while his brake lights were illuminated. (Bowling Dash Camera, 1:25–1:35). His brake lights came on as he passed several other cars on the roadway. Then, when plaintiff had passed the cars in the right lane, his brake lights went off with his hand still out the window. (Bowling Dash Camera, 1:37). He subsequently ran over the stop sticks. (Bowling Dash Camera, 1:43). It was not until Bowling began to pull up next to plaintiff's vehicle, in order to execute the PIT maneuver, that plaintiff's brake lights came on again. (Bowling Dash Camera, 1:49). When Bowling executed the PIT maneuver, the officers had already seen plaintiff brake without stopping while his arm was out the window. The fact that plaintiff hit the brakes again, immediately before the PIT maneuver, was no indication to the officers that this time, he intended to stop.

"[A] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott*, 550 U.S. at 386. Here, plaintiff was unharmed by the PIT maneuver, and similarly unharmed by Lieutenant Cherry's collision with the vehicle at five miles per hour. The termination of the car chase was effected with reasonable force and did not create a constitutional violation.

*b. <u>The Arrest—Unreasonable Detention and Excessive Force</u>*

"The Fourth Amendment is not violated by an arrest based on probable cause." *Graham*, 490 U.S. at 396. Even if plaintiff claims he "was not doing anything wrong to warrant a traffic stop[,]" it is undisputed that plaintiff knew the officers were attempting to pull him over and decided to flee. [DE 27, p. 2]. The defendant officers apprehended plaintiff after a high-speed car

chase, wherein plaintiff evaded arrest and violated numerous laws in so doing. The arrest itself was based on probable cause and did not create a constitutional violation.

Nor was plaintiff subjected to excessive force during the arrest. The defendant officers approached plaintiff's vehicle after the PIT maneuver with their guns drawn. [DE 31, ¶ 19]; [DE 43, ¶ 19]. But doing so to secure a suspect immediately after the termination of a high-speed car chase is not an excessive use of force. "'Approaching a suspect with a drawn weapon is an extraordinary measure,' but this level of intrusion can be justified 'as a reasonable means of neutralizing potential dangers to police and innocent bystanders.'" *See Dalton v. Liles*, No. 5:19-CV-00083-MR, 2021 WL 3493150, at *6 (W.D.N.C. Aug. 9, 2021) (cleaned up) (quoting *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993)). Because plaintiff had already fled in a dangerous manner, approaching plaintiff with drawn weapons was a reasonable means of ensuring he would not continue to risk injuring the officers or others.

Cherry pulled plaintiff out of the car, grabbing his arm and the back of his neck. Plaintiff claims Cherry pulled him by the hair. [DE 43, ¶¶ 22–23]. Cherry "admitted his hands may have gotten entangled in" plaintiff's hair. [DE 31, ¶ 23]. Cherry then put plaintiff face-down on the ground. The *Graham* factors tend to weigh in defendants' favor on the issue of their conduct in pulling plaintiff from the car. As already discussed, plaintiff's crime—leading the police on a high-speed car chase—was severe. Second, "the stopped person's conduct . . . indicates the nature and level of the threat he poses, either to the officer or to others." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). Defendants had every reason to believe that plaintiff was willing to create a danger to the police and others to avoid being apprehended. Third, despite plaintiff's argument that he "never resisted" and that "Lt. Cherry pulled [him from] the car when [he] still had [his] hands out the window" [DE 42, p. 7], as already discussed, the fact that plaintiff held a hand out the window was

no indication he intended to stop resisting. Plaintiff had held a hand out the window for quite a while before his car came to a stop. Even if plaintiff was not resisting at the very moment he was pulled from the car, the officers had little opportunity to assess his compliance between terminating the car chase and removing plaintiff from the car. Defendants were "forced to make split-second judgments—in circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force necessary." *See Graham v. Connor*, 490 U.S. at 397.

In the wake of a high-speed car chase, the officers' use of force was reasonable and left plaintiff unharmed.

> [D]espite plaintiff's claim that he was compliant with the officers' orders in the seconds after stopping but before being removed from the vehicle, he fails to acknowledge the larger factual context—that he had just led multiple officers on a vehicle chase. Even if the officers did not use the most gentle means to effectuate the arrest, it is difficult to see how forcibly pulling plaintiff from the vehicle after a vehicle chase would be excessive, given the possibility of danger suggested by one who has led police on a vehicle chase and who might have been armed.

*Graham v. Cox*, No. CV ELH-18-221, 2019 WL 1427860, at *13 (D. Md. Mar. 29, 2019). After plaintiff had been removed from the vehicle, Young "put his knee on the small of the plaintiff's back to keep him from rolling[.]" [DE 31, ¶ 24]; [DE 43, ¶ 24]. While handcuffing plaintiff, Young kept his knee "on the side of the plaintiff's lower back for about a minute and a half." [DE 30, p. 24]. "It was reasonable to hold down a potentially armed felony suspect who had repeatedly attempted to flee from officers[.]" *Dalton*, 2021 WL 3493150, at *7 (citing *Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017) for the proposition that "taking a resisting arrestee to the ground and pinning him so that he could be handcuffed was objectively reasonable"). Young did not harm plaintiff in pinning him. In the rapidly evolving context of the arrest, defendants did not effect an unreasonable seizure by securing plaintiff without using "the most gentle means to effectuate the arrest[.]" *Graham v. Cox*, 2019 WL 1427860, at *13.

Finally, because Sheriff Chism was not personally involved in the events giving rise to this case, any individual capacity claim against him fails. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017).

Because the officers' use of force did not violate the Fourth Amendment, they acted with qualified immunity. In addition to their qualified immunity defense, the defendants are entitled to judgment as a matter of law because no constitutional violation occurred.

**II. Official Capacity Claims**

"A claim against a public official in his official capacity is 'essentially a claim against' the governmental entity that the official represents." *Benbow v. Ingram*, No. 7:23-CV-00292-M-RJ, 2025 WL 2463641, at *11, n. 9 (E.D.N.C. Aug. 26, 2025) (quoting *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004)). "A suit against a deputy sheriff in his official capacity is in substance a claim against the office of the sheriff itself." *Stidham v. Beal*, No. 1:25-CV-00063-MR-WCM, 2026 WL 686465, at *4 (W.D.N.C. Mar. 11, 2026) (citing *Gannt v. Whitaker*, 203 F.Supp.2d 503, 508 (M.D.N.C. Feb. 26, 2002)). Because the official capacity claims asserted against all defendants are effectively claims against the Office of Sheriff of Brunswick County, they are duplicative and can be decided collectively.

Under *Monell v. New York City Dept. of Soc. Servs.*, a local government can be held liable under 42 U.S.C. § 1983 for its unconstitutional policies. 436 U.S. 658, 690–94 (1978). Liability is limited, however, and is not available on a *respondeat superior* theory. *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). Municipal liability results only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation;

> (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotations omitted). Plaintiff attempts to establish liability based on only the third theory—that Sheriff Chism is liable "for refusing to discipline[] officers" which resulted in the Sheriff's Office "not giving African Americans equal protection." [DE 1, p. 4].

Plaintiff's chief factual allegation in support of his failure-to-train claim is his contention that Cherry called him a racial slur in the aftermath of the arrest. [DE 42, p. 8]. Even in the light most favorable to plaintiff, the nonmoving party, the Court need not adopt plaintiff's version of this fact. *See Scott*, 550 U.S. at 380–81 (where a videotape of undisputed accuracy has captured the events in question, a court should view the facts in the light depicted by the videotape); *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) ("[W]hen a video quite clearly contradicts the version of the story told by the plaintiff so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (cleaned up). Cherry cannot be heard on the video footage uttering any racial slur, and the Court need not rely on a "visible fiction" that is "utterly discredited" by the record. *Scott v. Harris*, 550 U.S. at 380–81.

"No actionable claim against supervisors or local governments can exist without a constitutional violation committed by an employee." *Anderson v. Caldwell Cnty. Sheriff's Off.*, 524 F. App'x 854, 862 (4th Cir. 2013). Furthermore, because *Monell* liability "cannot be predicated on a theory of *respondeat superior*, a single incident is almost never enough to warrant municipal liability." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 672 (4th Cir.

2020), *as amended* (June 10, 2020). Because no underlying constitutional violation occurred, defendants are entitled to summary judgment on the official capacity claims asserted against them.

**III. Return of the Vehicle**

Plaintiff claims that the car he drove during the events giving rise to this action was seized by the Sheriff's Office and, despite a court order requiring the return of the car, the Sheriff's Office never returned the car. The car did not belong to plaintiff, but to his girlfriend. [DE 31, ¶ 21]; [DE 43, ¶ 21]. Plaintiff lacks standing to assert a claim based on wrongful retention of the car, because he did not own it. "Article III standing ... relates to the claimant's ability to show that he has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III." *United States v. $115,413.00 in U.S. Currency*, 770 F. Supp. 3d 862, 872 (E.D.N.C. 2025) (quoting *United States v. 8 Gilcrease Lane, Quincy Fla. 32351*, 641 F. Supp. 2d 1, 6 (D.D.C. 2009)). "To contest a forfeiture, one must have an ownership interest in the res. In other words, 'it is the owner or owners of the res who have standing to challenge a forfeiture.'" *Matthews v. United States*, 917 F. Supp. 1090, 1104 (E.D. Va. 1996) (cleaned up) (quoting *United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 604 F.2d 27, 28 (8th Cir. 1979)).

The Brunswick County Superior Court order explicitly orders that "the 2012 Honda Civic . . . be returned to the rightful owner Ragan Elizabeth Evans forthwith[.]" [DE 32-2]. Therefore, because Plaintiff does not have an ownership interest in the property, Plaintiff lacks standing to enforce a claim arising from the retention of the car.

<u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment [DE 29] is GRANTED. The Clerk is directed to enter judgment in favor of defendants and close the case.

SO ORDERED, this 15 day of September, 2026.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE